Filed 8/14/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S202107 |
| v. | ) | |
| | ) | Ct. App. 1/3 A124765 |
| RICHARD TOM, | ) | |
| | ) | San Mateo County |
| Defendant and Appellant. | ) | Super. Ct. No.  SC064912 |
| _____ | ) | |
| | ) | |
| In re RICHARD TOM, | ) | Ct. App. 1/3 A130151 |
| | ) | |
| on Habeas Corpus. | ) | San Mateo County |
| _____ | ) | Super. Ct. No.  SC064912 |

On a clear evening in February 2007, defendant Richard Tom broadsided at high speed a vehicle driven by Loraine Wong, who was making a left turn from Santa Clara Avenue onto Woodside Road in Redwood City.  Wong's younger daughter, Sydney Ng, eight, was killed; her older daughter, Kendall Ng, 10, sustained serious injuries.  The evidence at trial showed that defendant did not brake prior to the crash.  He had been speeding, although his precise speed was disputed.  He had been drinking earlier that evening, although (again) the amount he had consumed was disputed.

The issue before us arises from the People's reliance in their case-in-chief on defendant's failure to inquire about the occupants of the other vehicle as evidence that he was driving without due regard for their safety.  Did it violate the

Fifth Amendment privilege against self-incrimination to admit evidence that defendant, following his arrest but before receipt of *Miranda*[1] warnings, expressed no concern about the well-being of the other people involved in the collision?

The issue is one of first impression for this court. However, a plurality of the high court recently addressed the "closely related" issue of prearrest silence in *Salinas v. Texas* (2013) 570 U.S. ___, ___ [133 S.Ct. 2174, 2182] (plur. opn. of Alito, J.) (*Salinas*), and we find that analysis instructive. Declaring that "[t]he privilege against self-incrimination 'is an exception to the general principle that the Government has the right to everyone's testimony,' " the *Salinas* plurality applied "the 'general rule' that a witness must assert the privilege to subsequently benefit from it." (*Id.* at pp. ___ [133 S.Ct. at pp. 2179, 2181] (plur. opn. of Alito, J.).) We likewise apply the general rule here and conclude that defendant, after his arrest but before he had received his *Miranda* warnings, needed to make a timely and unambiguous assertion of the privilege in order to benefit from it. Because the Court of Appeal held that the Fifth Amendment privilege against self-incrimination categorically prohibited any reference to defendant's postarrest failure to inquire about the others involved in the collision without ever considering whether defendant had clearly invoked the privilege, we reverse the judgment of the Court of Appeal and remand for further proceedings.

**BACKGROUND**

Defendant was charged with gross vehicular manslaughter while intoxicated, driving under the influence causing harm to another, and driving with a blood-alcohol level of 0.08 percent or higher causing harm to another, along with various enhancement allegations. A jury acquitted defendant of the alcohol-related charges but convicted him of vehicular manslaughter with gross negligence

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

and found true the allegation that he personally inflicted great bodily injury on Kendall Ng. (Pen. Code, § 192, subd. (c)(1); *id*., former § 12022.7, subd. (a).) The court sentenced defendant to seven years in prison.

**Events Surrounding the Fatal Collision**

Defendant spent the early evening of February 19, 2007, entertaining his longtime friend Peter Gamino, a retired San Francisco police officer who was visiting from out of state. Defendant cooked a steak dinner at his Redwood City home and, after waking Gamino from a nap around 5:30 or 6:00 p.m., made them vodka tonics. Around 6:30 p.m., Gamino made another round of drinks. He did not know whether defendant finished that drink.

After dinner, defendant announced that they needed to pick up a vehicle from his son's home just north of Woodside Road. Gamino testified that defendant exhibited no signs of intoxication, but admitted defendant had trouble finding his son's house: "We didn't get there right away. Couldn't find our—the way. We eventually found it." On the return trip, defendant drove his Mercedes E320, and Gamino followed 100 to 150 yards behind in the Toyota Camry they had picked up at the son's house. Gamino was traveling at the speed limit.

As the two cars turned from Alameda de las Pulgas onto Woodside Road, defendant was about 200 yards ahead. Gamino accelerated on Woodside, but defendant remained "a ways ahead."

Meanwhile, Loraine Wong had left her home on Santa Clara Avenue in Redwood City to drive her daughters to an overnight visit at her sister's house in Sunnyvale. Her sister, Geneva, had a new baby, and the girls were excited to see their new cousin. They were bringing some books they had purchased at Barnes and Noble that evening.

As they left the house, Wong called Geneva to let her know that they were on their way. Wong had completed the call by the time she reached the

3

intersection of Santa Clara Avenue and Woodside (a two-lane divided state highway) less than a mile away, but the phone was still in her hand. Wong came to a full stop at the stop sign and inched forward, looking both ways. Her lights and blinker were on. She first looked left, and saw it was clear all the way to Alameda de las Pulgas, four-tenths of a mile away. She looked right, where it was also clear. Turning back to the left, she still saw no headlights or vehicles coming and began her turn onto Woodside. Wong, who had lived on Santa Clara Avenue for 15 years, had driven through this intersection several thousand times before.

This time was different. Suddenly, there was a flash of light, a feeling of soreness, and the pressure of the airbag. She had not seen headlights or heard any sound of braking, but Wong realized they had been hit. She looked outside but did not see any cars around her. She looked back and saw her daughters were unconscious and their faces were bleeding. As Wong climbed into the backseat, people nearby came to offer assistance. Wong shouted out her husband's phone number for someone to call him. Kendall regained consciousness, but Sydney never did. Sydney was pronounced dead at Stanford Hospital at 8:53 p.m. The cause of death was multiple blunt injuries. Kendall suffered a three-inch gash on her forehead, which was closed with 30 to 40 stitches, and a broken arm. She had to use a brace for her injured neck and spent a week in the hospital. Wong suffered internal injuries, a broken rib, and a broken finger. Pieces of broken glass had scratched her face, arms, knees, and feet.

Sergeant Alan Bailey of the Redwood City Police Department received a report of the crash at 8:20 p.m. and arrived at the scene 10 minutes later. Wong's vehicle, a 1996 Nissan Maxima, was badly damaged. The point of contact was the left rear quarter panel and passenger door, where there was a "massive intrusion." The left rear passenger window and the rear windshield were shattered; the front windshield was broken. Defendant's vehicle, a 2006 Mercedes E320, was

4

considerably north of the intersection, about 200 feet from the Nissan. Bailey testified that it was "incredible to see those vehicles that far apart in an accident that occurred in the city," where the posted speed limit is 35 miles per hour. The Mercedes had suffered major damage to its front end, a cracked windshield, a broken left-side mirror, and a couple of flat tires. Based on the circumstances at the scene, Bailey concluded that the Nissan had come from Santa Clara Avenue in a westbound direction turning left onto Woodside; the Mercedes had come north on Woodside "[e]xtremely fast," "[n]ot even close" to the speed limit; and there was a broadside collision.

Officer Janine O'Gorman, who arrived about an hour after Bailey, was assigned to be the lead investigator for this incident. She found no evidence that the Mercedes had applied its brakes prior to impact.[2] Based on the glass fragments, she opined that the Nissan had spun at least 360 degrees following the impact. She testified that although defendant's view of the intersection would have been partially obstructed by the Dodge Caravan parked on the corner of Woodside and Santa Clara as well as by the Arco sign at the corner gas station, in that those objects would have made it harder to see cars turning left onto Woodside, defendant was driving recklessly and was responsible for the collision.

Officer Jincy Pace, a traffic accident investigator with the San Jose Police Department, agreed that the Mercedes barreled into the left rear portion of the Nissan and spun it around and that the primary cause of the collision was the Mercedes's unsafe speed. Using a conservatively low "drag factor" (a measurement of the frictional relationship between the tire and the roadway), Pace calculated the Mercedes was traveling at a speed of at least 67 miles per hour prior

---

[2] Neighbor Nico Roundy testified that he did not hear any braking before the "really loud bang" at the intersection.

to the collision; the Nissan was traveling about 12 miles per hour. Pace estimated that the Mercedes would have been at least 334 feet away from the intersection at the time the Nissan began its turn and opined that the Nissan would thus have had the right of way. Pace estimated that the Nissan would have been in the intersection for at least three to four and one-half seconds prior to the collision, which would have given the Mercedes enough time to stop even if it were speeding at 67 miles per hour.

Defendant's friend Peter Gamino, on the other hand, testified that the Nissan pulled out from Santa Clara Avenue "fairly fast" and "instead of stopping like [it] should have, [the Nissan] drove right in front of [defendant]." However, Gamino conceded that he did not recall mentioning to officers at the scene that the Nissan drove right in front of defendant.

**Defendant's Postcollision Conduct**

Right after the collision, Gamino parked and went over to defendant's car to see if he was all right. Defendant said, "I didn't even see it." Once the paramedics arrived, Gamino returned to the Camry.

Defendant was behind the wheel of the Mercedes when police first arrived. Two paramedics, one in the front seat and one in the back, were attending to defendant. Officer Josh Price had a brief conversation with defendant but did not detect any odor of alcohol. When defendant's girlfriend arrived and he got out of the car, he was limping slightly and complained of an ankle injury. The paramedics tried to convince defendant to go to the hospital to be examined, but defendant declined because he was concerned that his insurance would not cover it.

At some point, defendant and his girlfriend walked over and got into Gamino's Camry. About 15 minutes later, Officer Price walked over to the Camry to talk to Gamino. Defendant interrupted them to ask whether he could walk

6

home, as he lived only half a block away. Price told him "no," since the investigation "obviously" was ongoing and he was needed at the scene. When defendant said his ankle hurt, he was given an ice pack. Despite the recommendation of the paramedics that he seek treatment, defendant signed a form declaring that he had refused to seek treatment "against medical advice."

Around 9:30 p.m., when Sergeant Bailey discovered that defendant was sitting in the Camry, he ordered defendant be moved to the rear of a patrol vehicle. Defendant's girlfriend was allowed to join him in the backseat. He was not handcuffed. In accordance with the police department's general policy to ask for a voluntary blood sample when a major injury collision has occurred (and to obtain a detailed statement from defendant), Sergeant Bailey asked defendant whether he would cooperate. Defendant said he would, although he seemed irritated that his blood could not be drawn at the scene. Defendant and his girlfriend were transported to the police station so that defendant's blood could be drawn. They arrived at 9:57 p.m. A paramedic was dispatched to the police station around 10:00 p.m., but Redwood City's contract with American Medical Response did not authorize a blood draw for suspicion of driving under the influence unless the suspect had first been placed under arrest. When Officer Price asked whether defendant would be willing to go to the hospital to get his blood drawn, defendant again seemed irritated. Defendant asked whether he could refuse and was told it would be in his interest to prove that he had nothing in his system.

Shortly thereafter, around 10:30 p.m., defendant asked to use the bathroom. He was accompanied there by Sergeant Bailey. While in the bathroom, defendant, who was limping, asked for an aspirin. Bailey, who was in "very close proximity" to defendant, for the first time noticed the odor of alcohol on his breath and the bloodshot and glassy appearance of his eyes. Back in the interview room, Officer Price likewise noticed the odor of alcohol on defendant, who had been chewing

7

gum at the crash scene and at the station. Officer Roman Gomez, too, smelled alcohol and noticed that defendant's eyes were bloodshot and glassy. Officer Price administered three field sobriety tests (the horizontal gaze nystagmus test, the Romberg test, and the finger-to-nose test), concluded that defendant had been under the influence of alcohol at the time of the collision, and arrested him. During his contact with Officer Price and Sergeant Bailey, defendant never asked them about the welfare of the other people involved in the collision.

Defendant's blood was drawn at 11:13 p.m., around three hours after the crash. The test revealed a blood-alcohol level of 0.04 percent. Using a burnoff rate of 0.02 percent of alcohol per hour (which is a rate widely accepted in the scientific community) and taking account of the steak dinner consumed by defendant as well as the other circumstances, criminalist Carlos Jose Jiron opined that defendant must have consumed six drinks and that his blood-alcohol level at the time of the crash was 0.098 percent. In Jiron's opinion, defendant would have been too impaired to drive safely.

**Police Interview of Peter Gamino**

Sergeant Paul Sheffield went to defendant's house around 11:30 p.m. to speak with defendant's houseguest, Peter Gamino. The interview was taped and played for the jury. Sergeant Sheffield noticed a large bottle of vodka, "much bigger than a fifth," in the kitchen. The bottle was two-thirds empty. Gamino, who was awakened by the police visit, seemed to have "had a drink or two." Gamino initially told police that he and defendant had nothing to drink during dinner, then admitted they had a "cocktail or so," but "no idea" how many. Gamino eventually claimed defendant had no more than two drinks, but he did not know whether defendant had anything to drink before he started making dinner. In describing defendant's driving prior to the collision, Gamino told police that although he and defendant were only a car length apart while waiting for the light

8

at the intersection of Alameda de las Pulgas and Woodside, defendant "was a long ways in front" of him after the turn onto Woodside. Indeed, Gamino had just made the turn when the crash occurred. Acknowledging the large vodka bottle that was more than half empty and the four missing tonic bottles, Gamino said, "Oh no, no, no, no. That was yesterday."

**Defense Case**

Kent E. Boots, who was retired from the Orange County Sheriff's Department and now performs collision reconstruction, disputed the drag factor calculation on which the prosecution's experts relied. He also denied that a driver on Woodside could lose his right of way because of excessive speed.

Traffic accident reconstructionist Christopher David Kauderer estimated that the Mercedes's pre-impact speed was between 49 and 53 miles per hour and the Nissan's pre-impact speed was between 7 and 9 miles per hour. He opined that the driver of the Nissan entered the roadway suddenly, violating the Mercedes's right of way, and that the driver of the Mercedes did not have sufficient time to react. Kauderer did not believe there was enough information to assign an appropriate drag factor to the Mercedes; the estimated drag factor had been the basis for the prosecution expert's estimate of the Mercedes's speed.

Forensic toxicologist Kenneth Allen Mark questioned the prosecution expert's estimate of defendant's blood-alcohol level at the time of the collision, an estimate that relied on retrograde extrapolation. Because retrograde extrapolation depends on so many factors that were unknown in this case, such as defendant's burnoff rate, how much food he had consumed and how quickly, the size of his liver, his physiological or emotional state, and whether defendant was in the absorption or elimination phase, Mark testified that it would not be possible to determine, with any degree of certainty, what defendant's blood-alcohol level had been at the time of the collision. In Mark's opinion, defendant's blood-alcohol

9

level at the time of the crash could have been as low as 0.01 or 0.02 percent. The fact that no one detected the odor of alcohol until 10:30 p.m. was consistent with a blood-alcohol level of substantially less than 0.08 percent at the time of the crash. Mark did concede, however, that the odor of vodka is less detectable than that of other liquor and that chewing gum would make detection even more difficult. Mark also stated that the field sobriety tests performed here would not necessarily indicate impairment from alcohol, since those are "highly variable" tests and could have been affected by defendant's ankle injury.

Paramedic Daniel Giraudo arrived at the scene at 8:24 p.m. He testified that defendant had a perfect score on a test of alertness. Giraudo did not smell alcohol on defendant, and he did not recall whether defendant was chewing gum at the time.

**Rebuttal**

Officer David Johnson, who was trained in accident reconstruction, testified that Kauderer's model vastly understated the Mercedes's pre-impact speed, since the model would imply a drag factor so unreasonably low as to equate to vehicles skidding on ice. Based on the damage to the vehicles, their points of rest, and other information, Johnson estimated that the circumstances were consistent with a pre-impact speed for the Mercedes of 67 miles per hour. Johnson further estimated that it would have taken Wong six to nine seconds to look left, right, and left again before pulling out into the intersection and then another three seconds to get to the point of impact. Under those assumptions, the Mercedes would have been between 884 and 1179 feet away, too far away to be perceived as a hazard.

**Arguments of Counsel Concerning Defendant's Failure to Inquire**

Both sides mentioned in argument to the jury the evidence of defendant's postarrest, pre-*Miranda* silence.

The district attorney found it "particularly offensive" that defendant "never, ever asked, hey, how are the people in the other car doing?  Not once. . . .  Now, you step on somebody's toe or you bump into someone accidentally, what is your first thing out of your mouth?  Whoops.  I'm sorry.  I'm not saying that he has to say sorry as an expression of his guilt or as some kind of confession, but simply as an expression of his regret.  Look, I'm sorry those people were hurt.  [¶]  Not once.  Do you know how many officers that he had contact with that evening?  Not a single one said that, hey, the defendant asked me how those people were doing.  Why is that?  Because he knew he had done a very, very, very bad thing, and he was scared.  [¶]  He was scared or—either that or too drunk to care."

Defense counsel argued in response that "there was a big point made of Richard Tom didn't ask about the condition of the people in the other vehicle.  He didn't care.  He wasn't telling the officers—asking the officers, what happened?  What's going on?  How are those other people?  [¶]  And I ask you:  What's that go to do with anything?  Does that help prove to you any element of the offense?  They kind of stuck it there under consciousness of guilt.  Does that have anything to do with the way you're supposed to look at the evidence in this case?  No.  It's there to make you dislike Mr. Tom, make you think he's a bad person, therefore, get you closer to deciding he's the one who caused this accident.  [¶]  My response to that, by the way, would be, police know at 8:53 there's a fatality in this case.  I asked . . . Sergeant Bailey, Officer Price, did you ever tell Richard Tom this was— there was a fatality, between 8:53 and his arrest around eleven o'clock?  They didn't.  Of course they didn't.  Why would they.  But you can't simultaneously blame him for not asking and not blame them for not telling."

**The Court of Appeal Decision**

The Court of Appeal consolidated the appeal (A124765) with a petition for writ of habeas corpus (A130151).  Although defendant did not object on Fifth

11

Amendment grounds to the evidence that he failed to inquire about the occupants of the other vehicle (nor did he object to the prosecutor's argument on that basis), the Court of Appeal addressed the merits of the Fifth Amendment claim and reversed the judgment. The Court of Appeal concluded that defendant was under de facto arrest when he was transported to the police station in a patrol vehicle at 9:48 p.m.; that "the right of pretrial silence under *Miranda* is triggered by the inherently coercive circumstances attendant to a de facto arrest"; that the trial court therefore erred in admitting evidence in the prosecution's case-in-chief of defendant's postarrest, pre-*Miranda* failure to inquire about the welfare of the occupants of the other vehicle; and that the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18. As to whether defendant ever invoked his privilege against self-incrimination, the court said simply that " 'the defendant who stands silent must be treated as having asserted it.' " (Quoting *U.S. v. Moore* (D.C.Cir. 1997) 104 F.3d 377, 384.)

We granted the People's petition for review. Our grant was limited to the admissibility of defendant's postarrest silence under the Fifth Amendment. No party challenged in the petition for review, the answer to the petition, or the extensive briefing here the Court of Appeal's decision to address the Fifth Amendment claim on the merits, nor does the Court of Appeal's conclusion on this procedural point present an issue worthy of review. (Cal. Rules of Court, rules 8.500(b)(1), 8.516(a), (b); *Southern Cal. Ch. Of Associated Builders etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 431, fn. 3.) We therefore will accept the lower court's conclusion that defendant's claim is cognizable (see *People v. Weiss* (1999) 20 Cal.4th 1073, 1076-1077) and turn to the issue presented in the petition for review—namely, whether the trial court violated the Fifth Amendment privilege against self-incrimination by admitting evidence that defendant, during the period following his arrest but prior to receipt

of *Miranda* warnings, failed to inquire about the welfare of the occupants of the other vehicle.

## DISCUSSION

The Fifth Amendment's self-incrimination clause states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) The clause does not, however, "establish an unqualified 'right to remain silent.' " (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2183] (plur. opn. of Alito, J.).) "By definition, 'a necessary element of compulsory self-incrimination is some kind of compulsion.' " (*Lakeside v. Oregon* (1978) 435 U.S. 333, 339.) The "sole" form of compulsion targeted by the Fifth Amendment privilege is "governmental coercion"—not " 'moral and psychological pressures . . . emanating from sources other than official coercion' " or the absence of " 'free choice' in any broader sense of the word." (*Colorado v. Connelly* (1986) 479 U.S. 157, 170.)

The high court has found governmental coercion where, for example, the prosecutor invites the jury to draw adverse inferences from a defendant's failure to take the witness stand. (*Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).) Although *Griffin* included a general statement that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt" (*Griffin*, *supra*, 380 U.S. at p. 615), the court has since clarified that the "broad dicta in *Griffin* . . . must be taken in the light of the facts of that case"—a prosecutor's comment on a defendant's right not to testify *at trial*. (*United States v. Robinson* (1988) 485 U.S. 25, 33-34.)

Consequently, the Fifth Amendment privilege against self-incrimination does not categorically bar the prosecution from relying on a defendant's pretrial silence. The prosecution may use a defendant's pretrial silence as impeachment, provided the defendant has not yet been Mirandized. (*Fletcher v. Weir* (1982) 455

13

U.S. 603 [postarrest silence]; *Jenkins v. Anderson* (1980) 447 U.S. 231 (*Jenkins*) [prearrest silence]; cf. *Doyle v. Ohio* (1976) 426 U.S. 610 [postarrest, post-*Miranda* silence is not admissible as impeachment].)  The prosecution may also use a defendant's prearrest silence in response to an officer's question as substantive evidence of guilt, provided the defendant has not expressly invoked the privilege.  (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).)  Whether postarrest, pre-*Miranda* silence in the absence of custodial interrogation may likewise be admitted as substantive evidence of guilt—and thus render a defendant's uncompelled silence admissible as substantive evidence of guilt *or* impeachment—has not yet been resolved by this court or the United States Supreme Court.

As noted by both parties, there is a split in the federal circuits and among state courts as to whether the Fifth Amendment bars the government from offering evidence in its case-in-chief of a defendant's postarrest, pre-*Miranda* silence, even where the silence purports to be an assertion of the privilege against self-incrimination.  (See *U.S. v. Pando Franco* (5th Cir. 2007) 503 F.3d 389, 395, fn. 1 [noting the split]; compare *State v. Johnson* (Minn.Ct.App. 2012) 811 N.W.2d 136, 148 [because arrestee "was under no government-imposed compulsion to speak," evidence of his silence "did not implicate the Fifth Amendment"] with *State v. Mainaaupo* (Hawaii 2008) 178 P.3d 1, 18-20 [comment on arrestee's exercise of his right to remain silent violated the 5th Amend.].)  The People argue that use of a defendant's postarrest, pre-*Miranda* exercise of the privilege in the absence of custodial interrogation raises no issue of governmental compulsion and thus is not barred by the Fifth Amendment.  (See, e.g., *U.S. v. Frazier* (8th Cir. 2005) 408 F.3d 1102, 1111 [because "an arrest by itself is not governmental action that implicitly induces a defendant to remain silent," the admission of defendant's postarrest, pre-*Miranda* silence "in the government's case-in-chief as evidence of

14

guilt did not violate his Fifth Amendment rights"]; *U.S. v. Rivera* (11th Cir. 1991) 944 F.2d 1563, 1568; *Ordway v. Commonwealth* (Ky. 2013) 391 S.W.3d 762, 778 ["Where 'no governmental action induce[s] the defendant to remain silent[,]' the *Miranda*-based fairness rationale does not control"]; *People v. Schollaert* (Mich.Ct.App. 1992) 486 N.W.2d 312, 316 [because "defendant's silence . . . did not occur during a custodial interrogation situation, nor was it in reliance on the *Miranda* warnings," it "was not a constitutionally protected silence"]; *State v. Johnson*, *supra*, 811 N.W.2d at p. 148 ["the state did not compel Johnson 'to speak at the time of his silence' "]; *State v. Byrne* (Vt. 1988) 542 A.2d 667, 670 ["As the arresting officer appears only to have commented on pre-*Miranda* silence, this eliminates defendant's claim under the federal constitution"]; see generally *Jenkins*, *supra*, 447 U.S. at pp. 243-244 (conc. opn. of Stevens, J.) ["When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment"].)  Defendant, like the Court of Appeal, counters that the protections of the Fifth Amendment privilege attach as soon as the defendant is in custody (or even earlier), and do not depend on the commencement of custodial interrogation.  (See, e.g., *U.S. v. Velarde-Gomez* (9th Cir. 2001) 269 F.3d 1023, 1029 ["the government may not burden that right by commenting on the defendant's post-arrest silence at trial"]; *U.S. v. Moore*, *supra*, 104 F.3d at p. 385 ["neither *Miranda* nor any other case suggests that a defendant's protected right to remain silent attaches only upon the commencement of questioning as opposed to custody"]; *U.S. v. Burson* (10th Cir. 1991) 952 F.2d 1196, 1200 ["silence . . . exhibited in a non-custodial interrogation" is protected by the Fifth Amendment]; *State v. Mainaaupo*, *supra*, 178 P.3d at p. 18 [quoting *Velarde-Gomez* and *Moore*].)

15

We need not resolve the split in authority as to whether the Fifth Amendment bars use of a defendant's postarrest, pre-*Miranda* exercise of the privilege against self-incrimination in the absence of custodial interrogation. Even assuming the privilege against self-incrimination protects against evidentiary use of postarrest silence in this context, the high court has "long acknowledged" (*Minnesota v. Murphy* (1984) 465 U.S. 420, 427) that the privilege "is not self-executing" and "may not be relied upon unless it is invoked in a timely fashion" (*Roberts v. United States* (1980) 445 U.S. 552, 559). We conclude that defendant had the burden to establish that he clearly invoked the privilege here.

## A

In *Davis v. United States* (1994) 512 U.S. 452, the high court held that a suspect who wishes to invoke the right to counsel during a custodial interview must "do so unambiguously." (*Id*. at p. 459.) "Although a suspect need not 'speak with the discrimination of an Oxford don' [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Ibid*.) To avoid difficulties of proof and to provide guidance to officers conducting interrogations—who must promptly cease questioning once a suspect has invoked the right to counsel—the inquiry is an objective one. (*Id*. at pp. 458-459.)

*Berghuis v. Thompkins* (2010) 560 U.S. 370 (*Berghuis*) considered the standard required to invoke the privilege against self-incrimination during a custodial interrogation. Declaring that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*," the high court concluded that an accused who wants to invoke the right to remain silent must likewise "do so unambiguously." (*Berghuis*, *supra*, 560 U.S. at p. 381.) "A

16

requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity. [Citation.] If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequences of suppression 'if they guess wrong.' " (*Berghuis*, *supra*, 560 U.S. at pp. 381-382.)

*Salinas* then applied the objective invocation rule outside the context of a custodial interrogation. In that case, police visited Genovevo Salinas at his home as part of a murder investigation. Salinas agreed to hand over his shotgun for ballistics testing and to accompany police to the station for questioning. The parties agreed that the interview was noncustodial and that Salinas had not been provided with *Miranda* warnings. Salinas answered most of the questions during the interview. But when asked whether his shotgun would match the shotgun shells recovered at the murder scene, Salinas " '[l]ooked down at the floor, shuffled his feet, bit his bottom lip, cl[e]nched his hands in his lap, [and] began to tighten up.' " (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) He then answered the officer's remaining questions. (*Ibid*.)

Salinas did not testify at trial, but the prosecution used his silence in reaction to the interview question about the shotgun as evidence of his guilt. (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) The Supreme Court granted certiorari to resolve the split of authority as to "whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief," but the plurality "found it unnecessary to reach that question" "because petitioner did not invoke the privilege during his interview." (*Id*. at p. ___ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)

The *Salinas* plurality began its analysis by explaining that "[t]he privilege against self-incrimination 'is an exception to the general principle that the Government has the right to everyone's testimony.' [Citation.] To prevent the privilege from shielding information not properly within its scope, we have long held that a witness who ' "desires the protection of the privilege . . . must claim it" ' at the time he relies on it." (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)[3] Salinas failed to do so. He answered the officer's questions for most of the interview, declined to answer whether his shotgun would match the shells recovered at the murder scene, and then offered answers to the officer's remaining questions. (*Id*. at p. ___ [133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) There was no violation of the Fifth Amendment in admitting evidence of the defendant's silence, the plurality concluded, "because he did not expressly invoke the privilege against self-incrimination in response to the officer's question." (*Ibid*.)

In justifying the application of the objective invocation rule in this new context, the plurality relied on the same two concerns the court had identified in previous cases—i.e., the need to avoid difficulties of proof and the need to provide guidance to law enforcement officers. (*Salinas*, *supra*, 570 U.S. at p. ___ [133

---

[3] Justice Alito's plurality opinion was joined by Chief Justice Roberts and Justice Kennedy. Justice Thomas, joined by Justice Scalia, concurred separately, expressing the view that *Griffin* was wrongly decided and therefore "Salinas' claim would fail even if he had invoked the privilege because the prosecutor's comments regarding his precustodial silence did not compel him to give self-incriminating testimony." (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2184] (conc. opn. of Thomas, J.).) Because the circumstances in which the plurality opinion deemed prearrest silence to be admissible—i.e., when the defendant has not expressly invoked the privilege—is a logical subset of the concurring opinion's view that prearrest silence is admissible regardless of whether the defendant invoked the privilege, the rule set forth in the plurality opinion states the holding of the court. (See *Marks v. United States* (1977) 430 U.S. 188, 193; *U.S. v. Epps* (D.C.Cir. 2013) 707 F.3d 337, 348-351.)

S.Ct. at p. 2179] (plur. opn. of Alito, J.).) The objective invocation requirement "ensures that the Government is put on notice when a witness intends to rely on the privilege so that it may either argue that the testimony sought could not be self-incriminating [citation] or cure any potential self-incrimination through a grant of immunity [citation]." (*Ibid.*) The requirement "also gives courts tasked with evaluating a Fifth Amendment claim a contemporaneous record establishing the witness' reasons for refusing to answer." (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)

Subsequent to *Salinas*, the Sixth Circuit held that the objective invocation rule applies not only when the suspect, prior to arrest, declines to answer a question, but also "where, as here, the silence did not occur in response to interrogation." (Dis. opn. of Liu, J., *post*, at p. 12.) In *Abby v. Howe* (6th Cir. 2014) 742 F.3d 221, Abby's fiancée testified for the prosecution, without objection, that he was hiding at her house when police came to interview her and that "although he probably could hear her talking to the detectives, Abby opted to stay concealed in a bedroom." (*Id.* at p. 224.) A " 'running theme' " of the prosecution's argument to the jury (*id.* at p. 227), again without an objection, was "that Abby hid in the bedroom rather than talking to the police while they were at [the fiancée]'s house" (*id.* at p. 224). The court concluded that Abby could not have been prejudiced by counsel's failure to object to the evidence of Abby's prearrest silence "because we now know that such an objection would be futile in light of *Salinas*." (*Id.* at p. 228.)

An unpublished decision of the Texas Court of Appeals then applied the objective invocation rule to a defendant's *postarrest*, pre-*Miranda* silence. In *Torres v. State* (Tex.App. June 12, 2014, No. 10-12-00263-CR) 2014 Tex. App. LEXIS 6354, a police officer spotted several items in the defendant's vehicle that matched the description of items reported stolen and testified that the defendant

19

offered no explanation as to why those items were in the back of his vehicle. (*Id.* at pp. *7-*8.) Relying on *Salinas*, the court concluded that the defendant "did not invoke his Fifth Amendment rights when he refused to offer an explanation to police for the items found in the back seat of the vehicle." (*Id.* at p. *9; see also *U.S. v. Jones* (E.D.N.Y. Mar. 11, 2014, No. 13-CR-438 (NGG)) 2014 U.S. Dist. LEXIS 32032, *17-*18 [postarrest silence was admissible where arrestee, who "initiated conversation" pre-*Miranda* "and then fell quiet after a brief back and forth," did not unequivocally assert the privilege].)

We likewise conclude that the objective invocation rule applies to defendant's postarrest, pre-*Miranda* silence. (*U.S. v. Graves* (4th Cir. Jan. 13, 2014, No. 12-4416) 2014 U.S. App. LEXIS 617, *12 [describing *Salinas* as a decision "[d]rawing no distinction between the invocation requirements before and after custody and *Miranda* warnings"].) Here, as in the situations discussed above, the objective invocation rule " 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." (*Berghuis*, *supra*, 560 U.S. at p. 381.) Without clear notice a suspect has invoked the privilege, the police would be deprived of the opportunity to "cure any potential self-incrimination through a grant of immunity." (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).) Moreover, because an invocation of the privilege must be " 'scrupulously honored' " (*Michigan v. Mosley* (1975) 423 U.S. 96, 104), a defendant who is deemed to have validly invoked the privilege may not be interrogated thereafter unless counsel has first been made available to the defendant or the defendant initiates further communications with the police. (*People v. Sims* (1993) 5 Cal.4th 405, 440.) If an ambiguous act, omission, or statement could qualify as an invocation, "police would be required to make difficult decisions about an accused's unclear intent and face the consequences of suppression 'if they guess wrong.' " (*Berghuis*,

20

*supra*, 560 U.S. at p. 382.)  Accordingly, the threshold inquiry in assessing the scope of the privilege against self-incrimination in the postarrest, pre-*Miranda* context is whether a reasonable police officer in the circumstances would understand that the defendant had invoked the privilege either at or prior to the silence at issue.  (See *Davis v. United States*, *supra*, 512 U.S. at p. 459; accord, *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238; cf. *U.S. v. Okatan* (2d Cir. 2013) 728 F.3d 111, 118 [the threshold inquiry concerning the admissibility of prearrest silence is "whether the defendant's silence constituted an 'assertion of the privilege against self-incrimination' "].)

**B**

The general rule that a witness who intends to rely on the privilege against self-incrimination must clearly invoke it has two "well-defined" exceptions. (*Minnesota v. Murphy*, *supra*, 465 U.S. at p. 429; see also *Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)  Neither applies here.

First, a criminal defendant need not take the stand and assert the privilege at his or her own trial.  (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.), citing *Griffin*, *supra*, 380 U.S. at pp. 613-615.)  An unambiguous invocation of the privilege at trial "would serve no purpose; neither a showing that his testimony would not be self-incriminating nor a grant of immunity could force him to speak."  (*Salinas*, *supra*, 570 U.S. at p. [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)  The *Griffin* exception does not apply here, and defendant does not contend otherwise.

Second, "a witness' failure to invoke the privilege must be excused where governmental coercion makes his forfeiture of the privilege involuntary." (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).) This exception applies when the government forces a choice between self-incrimination and some important public benefit such as public employment

(*Garrity v. New Jersey* (1967) 385 U.S. 493, 496-498), public office (*Lefkowitz v. Cunningham* (1977) 431 U.S. 801, 804-806), or public contracts (*Lefkowitz v. Turley* (1973) 414 U.S. 70, 84-85). (See *Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).) This exception can apply also when a regulatory regime makes the act of invoking the privilege—thereby identifying oneself to the government—inherently incriminating. (*Leary v. United States* (1969) 395 U.S. 6, 28-29; *Albertson v. Subversive Activities Control Bd.* (1965) 382 U.S. 70, 79.) And this exception can arise most commonly in the "inherently coercive environment created by . . . custodial interrogation" (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 599), where the *Miranda* court took the "extraordinary safeguard" of disallowing use in the case-in-chief of unwarned statements elicited during such interrogation. (*Minnesota v. Murphy*, *supra*, 465 U.S. at p. 430.) "Due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone the privilege 'unless [he] fails to claim [it] after being suitably warned.' " (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).)

Defendant, like Justice Liu's dissent, seizes on the last of these scenarios, seeking to distinguish *Salinas* on the ground that the defendant there was deemed not to be in custody. But custody alone—in this case, a de facto arrest[4]—does not deny an individual " 'a "free choice to admit, deny, or refuse to answer." ' " (*Minnesota v. Murphy*, *supra*, 465 U.S. at p. 429.) To the contrary, the high court has rejected the contention that " 'an arrest, by itself, is governmental action which implicitly induces a defendant to remain silent' " (*Fletcher v. Weir*, *supra*, 455

---

[4] Defendant was not formally arrested until approximately 11:00 p.m. The Court of Appeal determined that the restraint on defendant's freedom of movement ripened into a de facto arrest at 9:48 p.m., when police transported him and his girlfriend in a patrol vehicle to the police station for a blood test and interview.

22

U.S. at p. 606, quoting *Weir v. Fletcher* (6th Cir. 1981) 658 F.2d 1126, 1131) and has emphasized that the uniquely coercive environment that triggers the *Miranda* protections occurs "not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300.) Neither defendant nor the dissent explains how the de facto arrest here "deprived [him] of the ability to voluntarily invoke the Fifth Amendment." (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2180] (plur. opn. of Alito, J.); cf. *Jenkins*, *supra*, 447 U.S. at p. 240 ["no governmental action induced petitioner to remain silent before arrest"].)

The line between custody and custodial interrogation is a significant one. According to the United States Supreme Court, *Miranda*—and the custodial interrogation on which it relies—represents "a limited exception to the rule that the privilege must be claimed." (*Roberts v. United States* (1980) 445 U.S. 552, 560 (*Roberts*).) Because the high court has instructed that "the exception [to the objective invocation rule] does not apply outside the context of the inherently coercive custodial interrogations for which it was designed" (*ibid.*), we decline to extend the exception beyond its boundaries and therefore conclude that the objective invocation rule applies here.

Indeed, *Roberts* itself applied the objective invocation rule to a defendant who had been arrested. In that case, evidence was admitted at sentencing that the defendant had refused over a period of three years, preceding *and* following his arrest, to cooperate with the investigation of a criminal conspiracy in which he was a confessed participant. (*Roberts*, *supra*, 445 U.S. at pp. 553, 557.) In response to the defendant's complaint that use of his silence punished him for exercising his Fifth Amendment privilege against self-incrimination, the high court recognized,

23

as we do here, that the privilege "is not self-executing" and "may not be relied upon unless it is invoked in a timely fashion." (*Roberts*, *supra*, 445 U.S. at p. 559.) *Berghuis*, too, applied the general invocation rule to an arrestee who answered some questions and then fell silent. (*Berghuis*, *supra*, 560 U.S. at pp. 381-382.) The *Salinas* plurality relied on both *Roberts* and *Berghuis* as support for the objective invocation rule. (*Salinas*, *supra*, 570 U.S. at pp. ___ [133 S.Ct. at pp. 2181-2182] (plur. opn. of Alito, J.).)

Where a defendant could have invoked his privilege against self-incrimination at any point—but failed to do so—the prosecution's use in its case-in-chief of the defendant's postarrest, pre-*Miranda* silence in the absence of interrogation cannot be deemed a "penalty . . . for exercising a constitutional privilege" within the meaning of *Griffin*, *supra*, 380 U.S. at page 614. Nor does use of a defendant's postarrest, pre-*Miranda* silence in the absence of interrogation subject him to the "cruel trilemma" of incriminating himself, lying, or demonstrating his guilt by silence. (*Murphy v. Waterfront Comm'n* (1964) 378 U.S. 52, 55.) No such quandary arises because he could have invoked his privilege against self-incrimination without penalty at any point before *or* after his arrest.

## C

Although *Salinas* emphatically refused to adopt a "third exception" to "the 'general rule' that a witness must assert the privilege to subsequently benefit from it" (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at pp. 2180-2181] (plur. opn. of Alito, J.)), Justice Liu's dissent depends entirely on the recognition of such an exception. In the view of the dissent, all postarrest, pre-*Miranda* silence should be inadmissible, even though "the true reason" for the custodial silence may be "something other" than the intent to invoke the privilege in an individual case. (Dis. opn. of Liu, J., *post*, at p. 18.) It is difficult to square the dissent's approach

with its concession that the Fifth Amendment "protects silence that constitutes an exercise of the privilege against self-incrimination, not silence attributable to other reasons." (*Id*. at p. 11.)

To reconcile those two positions, Justice Liu's dissent theorizes that *Salinas*'s reliance on the general rule was "premised on the relatively uncertain reasons for silence in the noncustodial context," and posits that silence after an arrest "gives rise to a much stronger inference of reliance on the Fifth Amendment privilege." (Dis. opn. of Liu, J., *post*, at p. 17.) But the application of the objective invocation rule in *Salinas* rested not on the likelihood that a suspect in general might wish to rely on the privilege in the prearrest context, but on the fact that Salinas "alone knew why he did not answer the officer's question." (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2182] (plur. opn. of Alito, J.).) Indeed, *Salinas* explicitly acknowledged "that reliance on the Fifth Amendment privilege is *the most likely explanation* for silence in a case such as this one," yet deemed that likelihood to be insufficient to justify an exception to the general rule. (*Ibid*., italics added.) Although a suspect, before or after arrest, may choose to remain silent in reliance on the constitutional privilege, the suspect may also be silent "because he is trying to think of a good lie, because he is embarrassed, or because he is protecting someone else. Not every such possible explanation is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment." (*Ibid*.) To distinguish between those silences that are protected by the privilege from those that are not, it is the defendant's " 'burden . . . to make a timely assertion of the privilege.' " (*Ibid*.) Here, as in most other contexts, the protections of the privilege hinge on whether the defendant clearly invoked the privilege—"popular misconceptions notwithstanding." (*Ibid*.)

Moreover, the " 'the general principle that the Government has the right to everyone's testimony' " (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2183]

25

(plur. opn. of Alito, J.)) unquestionably applies to testimony by silence. As *Salinas* made clear, the objective invocation rule "applies with equal force," "regardless of whether prosecutors seek to use silence or a confession that follows." (*Id*. at p. ___ [133 S.Ct. at p. 2182] (plur. opn. of Alito, J.).)

**D**

Defendant relies heavily on two pre-*Miranda*[5] decisions, *People v. Cockrell* (1965) 63 Cal.2d 659 and *In re Banks* (1971) 4 Cal.3d 337, to argue that his postarrest silence was inadmissible, but his reliance is misplaced. Both cases involved the admissibility of silence *in the face of custodial interrogation*. In *Cockrell*, it was the defendant's postarrest silence in the face of an officer's question as to "what he had to say about" a codefendant's accusation. (*Cockrell*, *supra*, 63 Cal.2d at p. 669.) Anticipating the *Miranda* decision, we said that the Fifth Amendment "proscribes drawing an inference adverse to the defendant from his failure to reply to an accusatory statement *if* the defendant was asserting his constitutional privilege against self-incrimination" and that the privilege could be recognized in the context of custodial interrogation even if the defendant did not "express[ly] claim" it. (*Cockrell*, *supra*, 63 Cal.2d at pp. 669-670, italics added; accord, *Salinas*, *supra*, 570 U.S. at p. ___ [133 S.Ct. at p. 2180] (plur. opn. of Alito, J.).) In *Banks*, it was the use of a defendant's silence in the face of an accusation and search of his person by a police officer and in the face of an accusation by a witness viewing the defendant at a postarrest police lineup. (*Banks*, *supra*, 4 Cal.3d at pp. 345, 347.) The People conceded that *Cockrell* applied to the defendant's silence in the face of the accusation at the postarrest

---

[5]     Cockrell was tried and convicted in January 1963 (*People v. Cockrell*, *supra*, 63 Cal.2d at p. 662); Banks was tried and convicted in August 1962 (*In re Banks*, *supra*, 4 Cal.3d at p. 340). In *People v. Rollins* (1967) 65 Cal.2d 681, 686, we decided to follow "the conclusion of the United States Supreme Court that *Miranda* should not extend to trials which began before June 13, 1966."

lineup but argued that it did not apply to his silence in the face of the police officer's accusation, given that the defendant had not yet been formally arrested at the time the police officer searched him. (*Banks*, *supra*, 4 Cal.3d at p. 352.) We held that the prohibition on commenting on a defendant's silence in the face of custodial interrogation "certainly" applies where " 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way,' " even if he "may not have been formally arrested at the moment the police began to search him." (*Ibid*., quoting *Miranda*, *supra*, 384 U.S. at p. 444; see generally *California v. Beheler* (1983) 463 U.S. 1121, 1125 ["the ultimate inquiry" as to "whether a suspect is 'in custody' " under *Miranda* is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"].) Neither case considered the admissibility of a defendant's postarrest, pre-*Miranda* silence *prior to* custodial interrogation or whether the burden was on the defendant to invoke the privilege in those circumstances.

Indeed, none of the cases cited by defendant or his amicus curiae analyzes the threshold question whether the privilege must be timely and unambiguously invoked if the defendant wishes to bar use of postarrest, pre-*Miranda* silence that occurs in the absence of custodial interrogation. In many of the cited cases, the defendant actually invoked his rights. (*U.S. v. Okatan*, *supra*, 728 F.3d at p. 118 ["Okatan successfully asserted the privilege when he told [the Border Patrol agent] that he wanted a lawyer"]; *Combs v. Coyle* (6th Cir. 2000) 205 F.3d 269, 286 ["Combs clearly invoked the privilege against self-incrimination by telling the officer to talk to his lawyer, thus conveying his desire to remain silent without a lawyer present"]; *U.S. v. Burson*, *supra*, 952 F.2d at p. 1200 ["we have little trouble in concluding Mr. Burson invoked his privilege against self-incrimination"]; *Coppola v. Powell* (1st Cir. 1989) 878 F.2d 1562, 1567 ["petitioner's statement invoked his privilege against self-incrimination"]; *U.S. ex*

27

*rel. Savory v. Lane* (7th Cir. 1987) 832 F.2d 1011, 1015 [defendant told police "that 'he didn't want to talk about it, he didn't want to make any statements' "].) One case involved a defendant's silence in response to unwarned custodial interrogation, which is the classic exception set forth in *Miranda* to the objective invocation rule. (*U.S. v. Velarde-Gomez*, *supra*, 269 F.3d at p. 1032 [holding inadmissible "the use of silence in the face of questioning about incriminating evidence"].) Another case simply assumed that mere silence necessarily invoked the privilege without considering whether or how that silence, along with the other circumstances, made it clear that the defendant was invoking the privilege. (*U.S. v. Moore*, *supra*, 104 F.3d at p. 385 ["the defendant who stands silent must be treated as having asserted it"]; see also *U.S. v. Osuna-Zepeda* (8th Cir. 2005) 416 F.3d 838, 846 (conc. opn. of Lay, J.) ["For purposes of the Fifth Amendment, silence is the same as a statement invoking the right to remain silent"].) The remainder simply fail to consider the threshold question of invocation of the privilege altogether. (*U.S. v. Whitehead* (9th Cir. 2000) 200 F.3d 634, 637-639 (en banc); *U.S. v. Hernandez* (7th Cir. 1991) 948 F.2d 316, 322-324; *State v. VanWinkle* (Ariz. 2011) 273 P.3d 1148, 1150-1152.) Consequently, none is persuasive authority on the question whether "the 'general rule' " that a witness must clearly and timely "assert the privilege to subsequently benefit from it" (*Salinas*, *supra*, 570 U.S. at p. ___ [133 S. Ct. at p. 2181]) applies in these circumstances.

## E

The Court of Appeal also feared that, as a policy matter, allowing comment on a defendant's postarrest, pre-*Miranda* silence prior to custodial interrogation would " 'create an incentive for arresting officers to delay interrogation in order to create an intervening "silence" that could then be used against the defendant.' " (Quoting *U.S. v. Moore*, *supra*, 104 F.3d at p. 385.) But a defendant could easily

eliminate any such risk by clearly and timely invoking the privilege. Moreover, the Court of Appeal's assumption that a delay in interrogation is necessarily unjustified ignores the government's interest in ensuring that questioning be conducted under circumstances that allow for proper documentation of the interview by law enforcement personnel who are trained in interrogation techniques. Indeed, the record here showed that defendant needed to be taken to the station not only to give a detailed taped statement, but also to provide a blood sample—which was required by department policy in all major injury collisions and likewise could be done only in a controlled environment. (Cf. *Missouri v. Seibert* (2004) 542 U.S. 600, 621 (Kennedy, J., concurring in judgment) [postwarning interview following use of "the two-step technique" was inadmissible where the tactic was a "deliberate" attempt to undermine the *Miranda* warning and there were no "legitimate objectives that might otherwise justify its use"].)

In any event, the same incentive to delay *Miranda* warnings already exists by virtue of the high court's decision in *Fletcher v. Weir*, *supra*, 455 U.S. 603, which allows a defendant's postarrest, pre-*Miranda* silence to be used as impeachment. (See *People v. Fondron* (1984) 157 Cal.App.3d 390, 397-398 ["this procedure," i.e., " 'manipulat[ing] the facts by asking no questions immediately after the arrest, in order to use the defendant's silence against him,' " "is approved by United States Supreme Court precedent"].) In fact, the Sixth Circuit decision in *Weir v. Fletcher*, *supra*, 658 F.2d 1126, which the high court overturned in its per curiam opinion, rested on precisely the same policy argument—i.e., that allowing postarrest, pre-*Miranda* silence to be used for impeachment "would discourage the reading of *Miranda* warnings" at the time of arrest. (*Weir v. Fletcher*, *supra*, 658 F.2d at p. 1132.) The Sixth Circuit feared in particular that "[t]he police could simply arrest a suspect and be careful not to interrogate him for

29

15-20 minutes.  If the police wanted to question the suspect, they could then read the *Miranda* warnings.  If the suspect had remained silent for those 15-20 minutes, that silence could then be used for impeachment at trial." (*Ibid.*)  Neither defendant nor the Court of Appeal has explained why this concern, which failed to persuade the high court in *Fletcher v. Weir*, *supra*, 455 U.S. 603, should have any greater force here.  (See generally Thompson, *Evading* Miranda*: How* Seibert *and* Patane *Failed to "Save"* Miranda (2006) 40 Val. U. L.Rev. 645, 655 ["The Supreme Court did not share the circuit court's concerns about losing the benefits of prompt warnings by creating an incentive deliberately to delay warnings"; thus, "the *Fletcher* case means that the government always benefits from delaying the issuance of warnings"].)  Indeed, given that police officers confronting a suspect have no way of knowing whether the suspect will speak or remain silent (or even whether the suspect would take the stand at an eventual trial), the incentive to delay *Miranda* warnings in hopes of obtaining silence that could be used in the case-in-chief or as impeachment must be a very weak one.  (See Snyder, *A Due Process Analysis of the Impeachment Use of Silence in Criminal Trials* (1988) 29 Wm. & Mary L.Rev. 285, 324, fn. 222.)[6]

---

[6]    Some state courts view the calculus differently and have interpreted their own constitutions to bar the use of postarrest, pre-*Miranda* silence for impeachment.  (E.g., *Adams v. State* (Alaska 2011) 261 P.3d 758, 765; *State v. Hoggins* (Fla. 1998) 718 So.2d 761, 769-770; *Com. v. Spotz* (Pa. 2005) 870 A.2d 822, 831; *Sanchez v. State* (Tex.Crim.App. 1986) 707 S.W.2d 575, 578; *State v. Davis* (Wn.Ct.App. 1984) 686 P.2d 1143, 1145.)  Although the Court of Appeal used to follow what it called "the 'California rule,' " which likewise "forbade cross-examination or commentary on a defendant's postarrest silence whether *Miranda* warnings were given or not" (*People v. Delgado* (1992) 10 Cal.App.4th 1837, 1841), the Truth-in-Evidence provision of our state Constitution (Cal. Const., art. I, § 28, subd. (f)(2)), which directs that " 'evidence of [a defendant]'s pre-*Miranda* silence may be excluded only if application of the exclusionary rule is compelled by federal law' " (*Delgado*, *supra*, 10 Cal.App.4th at p. 1841), now forecloses such a rule.

## F

The Court of Appeal, which did not have the benefit of the *Salinas* decision, found a violation of the Fifth Amendment privilege in the admission of defendant's postarrest, pre-*Miranda* silence based solely on the fact defendant was in custody and was silent as to the welfare of the others involved in the crash, without considering whether or when defendant ever invoked the privilege. This was error. As stated, a defendant must invoke the privilege in order to claim its protections, and the invocation must be "unambiguous." (*Berghuis*, *supra*, 560 U.S. at p. 381.) The record here shows that defendant answered Officer Price's questions as to what happened when Price first arrived at the scene, that defendant asked the officers whether he could go home, that defendant complained to police about an ankle injury, and that defendant expressed reluctance about going to the police station to have his blood drawn but eventually agreed to go to the station. Following his de facto arrest, defendant continued to speak with the officers. In particular, he asked at the station whether he could refuse to have his blood drawn and he asked for permission to use the bathroom and for an aspirin. Whether these or other circumstances made it clear to the officers that he had invoked his privilege against self-incrimination is for the Court of Appeal to analyze in the first instance, along with the remainder of defendant's claims, if necessary. (See *id*. at p. 406, fn. 6 (dis. opn. of Sotomayor, J.).)

Our conclusion that use of a defendant's postarrest, pre-*Miranda* silence is not barred by the Fifth Amendment in the absence of custodial interrogation or a clear invocation of the privilege does not mean that evidence overcoming those constitutional hurdles would necessarily be admissible under the Evidence Code. (*People v. Aquino* (Ill.App.Ct. 1992) 605 N.E.2d 684, 688 [" 'difficulties of inference [concerning postarrest silence] are subjects for state law' "]; cf. *Fletcher v. Weir*, *supra*, 455 U.S. at p. 607 ["A State is entitled . . . to leave to the judge and

31

jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony"]; *Jenkins*, *supra*, 447 U.S. at p. 239.)  The probative value of a defendant's silence depends peculiarly on a careful assessment of all of the relevant circumstances. (Compare *United States ex rel. Bilokumsky v. Tod* (1923) 263 U.S. 149, 153-154 ["Silence is often evidence of the most persuasive character"] with *United States v. Hale* (1975) 422 U.S. 171, 176 ["In most circumstances silence is so ambiguous that it is of little probative force"].)  In the context of silence that immediately precedes or follows an arrest, some courts have held that the defendant's silence in the circumstances presented was "too ambiguous to have probative value as an indicator of guilt and any probative value would be outweighed by the prejudice to the defendant at trial." (*Weitzel v. State* (Md. 2004) 863 A.2d 999, 1003.)  One source of ambiguity is the ubiquity of *Miranda* warnings in popular culture and the extent to which a defendant may have subjectively intended to rely on the privilege, even if that intent was not communicated to law enforcement officers. (See *Ex Parte Marek* (Ala. 1989) 556 So.2d 375, 381; *People v. Quintana* (Colo. 1983) 665 P.2d 605, 610-611; *People v. Aquino*, *supra*, 605 N.E.2d at p. 688; *Weitzel*, *supra*, 863 A.2d at p. 1005; *Irwin v. Commonwealth* (Mass. 2013) 992 N.E.2d 275, 289; *Morris v. State* (Nev. 1996) 913 P.2d 1264, 1267; *People v. DeGeorge* (N.Y 1989) 541 N.E.2d 11, 13.)  The probative value of the evidence will also depend on the extent to which one would expect a person in the particular circumstances to speak or volunteer a statement.  (See *State v. Deatore* (N.J. 1976) 358 A.2d 163, 174 (conc. opn. of Sullivan, J.).)  Whether and how these factors should weigh in these particular circumstances—where the defendant spoke freely about the circumstances of the collision and his own needs but never inquired about the status of the others involved in the collision, despite the extensive damage to their vehicle—is beyond the scope of our grant of review, but they

32

remain available for the Court of Appeal to consider on remand if presented with a claim of error on those grounds.

In future cases, the better practice for a party seeking to offer evidence of postarrest, pre-*Miranda* silence or a party seeking to exclude such evidence is to proceed by way of a motion in limine, which will offer the trial court the opportunity to develop a record as to whether the circumstances would have made it clear to the officer that the defendant had invoked the privilege against self-incrimination, whether the evidence of silence is relevant, and, if so, whether its probative value is substantially outweighed by the probability of undue consumption of time or undue prejudice under Evidence Code section 352.

## DISPOSITION

The judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.

BAXTER, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
CHIN, J.
CORRIGAN, J.

**DISSENTING OPINION BY WERDEGAR, J.**

The majority concludes a defendant may not rely on his Fifth Amendment rights as a basis for challenging the admission in the People's case-in-chief of his postarrest, pre-*Miranda*[1] warning silence if he fails to affirmatively invoke those rights to police. Were I to reach the question, I would agree with my colleague Justice Liu's analysis of the constitutional issue. (Dis. opn., *post*, at pp. 11–20.) However, I conclude that by failing to make a timely and specific objection on this ground, defendant failed to preserve the issue for appellate review. Because I am unpersuaded by the majority's explanation why it has chosen to resolve this case based on a claim that was forfeited in the trial court, I dissent.

**I.**

The evidence of defendant's silence—that is, his failure to inquire after the welfare of the people in the car he crashed into—was twice placed before the jury. First, during Officer Price's testimony, the prosecutor asked him, "when [defendant] made [his] request to go home, had he asked you any questions about the condition of the occupants in the Nissan?" Officer Price simply answered: "No." Defendant interposed no Fifth Amendment objection. Later, when questioning Sergeant Bailey, the prosecutor asked him: "So, during any of this

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436.

time [prior to defendant's arrest at the police station, did] the defendant ever ask you about the occupants of the other vehicle?"  Bailey replied:  "No, he did not."  Again there was no Fifth Amendment objection.

The question of defendant's silence was later raised during the prosecutor's closing argument.  During that argument, the prosecutor addressed the conflicting expert evidence that attempted to reconstruct defendant's speed at impact, presumably because the greater the speed, the more likely the jury would find defendant was not merely negligent but grossly so.  The prosecutor argued that because defendant was travelling at more than twice the posted limit, the jury should infer that he did not care about the consequences of his actions.  The prosecutor then said:  "The next one I think is particularly offensive; he never, ever asked, hey, how are the people in the other car doing?  Not once. . . .  Now you step on somebody's toe or you bump into someone accidentally, what is your first thing out of your mouth?  Whoops.  I'm sorry.  I'm not saying that he has to say sorry as an expression of his guilt or as some kind of confession, but simply as an expression of his regret.  Look, I'm sorry those people were hurt.

"Not once.  Do you know how many officers he had contact with that evening?  Not a single one said that, hey, the defendant asked me how those people were doing.  Why is that?  Because he knew he had done a very, very, very bad thing, and he was scared."  Defendant raised no objection to this argument.

## II.

As a general rule, a timely and specific objection at trial to the admission of evidence is a necessary prerequisite before one may challenge on appeal the admissibility of the evidence.  This rule of appellate procedure requiring the

preservation of claims is one of both statutory (Evid. Code, § 353)[2] and decisional law (see, e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 961). The same rule applies to appellate claims of prosecutorial misconduct: " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820; see *People v. Thompson* (2010) 49 Cal.4th 79, 126.)

This forfeiture rule, while subject to some exceptions,[3] serves an important function, for a timely and specific objection "provide[s] the trial court and any moving party the opportunity to meet and cure any defect to which an objection has been made." (*People v. Chaney* (2007) 148 Cal.App.4th 772, 779; see *People v. Williams* (1997) 16 Cal.4th 153, 254 [regarding claims of prosecutorial misconduct, the "primary purpose of the requirement that a defendant object at trial . . . is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice"].)

---

[2]    Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:

"(a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and

"(b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

[3]    See, e.g., *People v. Hill*, *supra*, 17 Cal.4th at p. 820 ("A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile.").

When, as here, we decide a question of constitutional law, the rule requiring a timely and specific objection is animated by more than mere judicial efficiency or practicality. "As the United States Supreme Court reiterated, 'A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.' " (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230–231.) Lacking a true controversy before the court, considerations of judicial restraint direct that we not reach out to decide gratuitously unsettled questions of constitutional law. " 'It is well established that "we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." ' " (*People v. Brown* (2003) 31 Cal.4th 518, 534 [unanimous opinion of the court by Werdegar, J.].)

This reasoning gains additional force when, as here, an appellate court confronts a constitutional question whose answer is both difficult and unsettled. That the issue before us today has no easy answer is amply illustrated by an examination of the majority's supporting legal authority. It relies on (1) a hopelessly fractured decision by the United States Supreme Court in which none of the three legal theories in play obtained the support of a majority of the justices (*Salinas v. Texas* (2013) 570 U.S. ___ [186 L.Ed.2d 376, 133 S.Ct. 2174]); (2) a lower federal court case in which the evidence of the defendant's prearrest silence was admitted without objection (*Abby v. Howe* (6th Cir. 2014) 742 F.3d 221); and (3) an unpublished memorandum opinion by an intermediate state court in Waco, Texas (*Torres v. State* (Tex.App. June 12, 2014, No. 10-12-00263-CR) 2014 Tex. App. Lexis 6354), a state whose own rules provide that unpublished cases have no precedential value (see *Carrillo v. State* (Tex.App. 2003) 98 S.W.3d 789, 794; see Tex. Rules of App. Proc., rule 47.7).

4

Given this uncertainty in the law, considerations of judicial restraint counsel that we decline to decide the merits of a case in which the aggrieved party forfeited the claim for appeal, for "[c]onstitutional analysis should not be embarked on lightly and never when a case's resolution does not demand it." (*People v Giles* (2007) 40 Cal.4th 833, 857, conc. opn. of Werdegar, J.) We recently sounded this precise theme in *Robey v. Superior Court* (2013) 56 Cal.4th 1218, a unanimous decision of the court: "Our admonition is rooted in principles of judicial restraint, which have particular salience *when courts are confronted with unsettled constitutional issues*. ' "In an emerging area of the law, we do well to tread carefully and exercise judicial restraint, deciding novel issues only when the circumstances require." ' " (*Id*. at p. 1243, italics added.)

The majority's decision to extend this court's reach to expound on a forfeited claim is the antithesis of the light step I find appropriate in this case, and its explanation for the departure from proper appellate procedure is unpersuasive. That this court can limit its review to one of several issues decided by a lower court (Cal. Rules of Court, rule 8.516(a)(1) ["the Supreme Court may specify the issues to be briefed and argued"]), as the majority observes, does not speak to whether it is prudent to overlook a party's forfeiture to reach out unnecessarily to decide that issue. That no party sought review of the forfeiture issue is of no moment; defendant certainly had no incentive to do so, as the Court of Appeal excused his omission to reverse his conviction. In any event, this court "may decide any issues that are raised or fairly included in the petition or answer" (Cal. Rules of Court, rule 8.516(b)(1)), and the question of forfeiture is fairly included in the Fifth Amendment issue presented in this case. Finally, the cases the majority cites in support of its choice to address the issue (*Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 431, fn. 3; *People v. Weiss* (1999) 20 Cal.4th 1073, 1076–1077) hold

merely that this court may choose to decide one of two or more potentially dispositive issues; significantly, neither case addresses a forfeited issue, the application of Evidence Code section 353, or the wisdom of overlooking a party's failure to object.

## CONCLUSION

Concerning the constitutional question of whether using a defendant's postarrest, pre-*Miranda* warning silence against him violates his right against compelled self-incrimination under the Fifth Amendment, the majority makes the somewhat paradoxical choice to overlook defendant's forfeiture of the issue in the trial court by his failure to object, in order to conclude he may have forfeited his Fifth Amendment rights at the scene by failing to invoke them. Justice Liu persuasively explains why the majority misconstrues *Salinas v. Texas*, *supra*, 186 L.Ed.2d 376, and that we should assume a person in that situation was choosing to remain silent in reliance on his or her rights under the Fifth Amendment. (Dis. opn., *post,* at pp. 15–18.) I would join his opinion were the issue properly before this court. But because I find no plausible justification for overlooking defendant's forfeiture of the issue in the trial court, I conclude we should decline to reach this difficult constitutional issue and should instead dismiss the case as improvidently granted. (Cal. Rules of Court, rule 8.528(b).) Because the majority has chosen to reach out and address an issue not properly before us, I dissent.


**WERDEGAR, J.**

**DISSENTING OPINION BY LIU, J.**


As anyone who has ever watched a crime drama on television knows, a suspect who is placed under arrest "has a right to remain silent," and "any statement he does make may be used as evidence against him." (*Miranda v. Arizona* (1966) 384 U.S. 436, 444 (*Miranda*).) The *Miranda* warnings, which "have become part of our national culture" (*Dickerson v. United States* (2000) 530 U.S. 428, 443), serve as an essential safeguard to protect the Fifth Amendment right against self-incrimination in the context of custodial interrogation. But whether interrogated or not, a suspect in custody has a right under the Fifth Amendment not to incriminate himself. And often the best way not to incriminate oneself is to say nothing.

The court today holds, against commonsense expectations, that remaining silent after being placed under arrest is not enough to exercise one's right to remain silent. If the police have not given *Miranda* warnings, the court says, a suspect in custody cannot later claim the protection of the Fifth Amendment unless he breaks his silence and "clearly invoke[s]" the privilege in a manner that "a reasonable police officer in the circumstances would understand." (Maj. opn., *ante*, at p. 21.)

But why? No one disputes that if the police in this case had given *Miranda* warnings to defendant Richard Tom immediately upon placing him in custody, the prosecutor could not have relied on his postarrest silence to show consciousness of

guilt regardless of whether he clearly invoked the Fifth Amendment privilege. Why should the result be any different simply because the police did not give him the *Miranda* warnings until some time later? Whether warned or not, Tom knew that he had been involved in a serious car crash and that the police had put him in custody because they suspected he was criminally liable. Indeed, the prosecutor argued that Tom never asked about the occupants of the other vehicle because "he knew he had done a very, very, very bad thing, and he was scared," and because "he was obsessed with only one thing, that is, saving his own skin." On the prosecutor's own account, Tom's foremost concern naturally would have been to avoid incriminating himself. To hinge the protection of the Fifth Amendment on whether his silence occurred before or after he was given *Miranda* warnings makes no sense. It simply "create[s] an incentive for arresting officers to delay interrogation in order to create an intervening 'silence' that could then be used against the defendant." (*United States v. Moore* (D.C. Cir. 1997) 104 F.3d 377, 385 (*Moore*).)

Moreover, the court does not explain how its rule is supposed to work in practice. As Tom sat in the back seat of the patrol car, he was not being questioned by the police. To whom and how should he have invoked the Fifth Amendment privilege? Was he required to approach an officer on his own initiative and blurt out, "I don't want to talk"? Would it have been enough for Tom to say just that, without mentioning the Fifth Amendment or otherwise indicating he didn't want to incriminate himself? And if so, how would that have been materially different from simply remaining silent? Moreover, why should it matter whether Tom invoked the privilege *to a police officer*? What purpose would that have served, since no police officer was trying to question him?

Today's decision conflicts with Ninth Circuit precedent holding that "the government may not comment on a defendant's post-arrest, pre-*Miranda* silence

2

in its case-in-chief because such comments would 'act [] as an impermissible penalty on the exercise of the . . . right to remain silent.' " (*United States v. Velarde-Gomez* (9th Cir. 2001) 269 F.3d 1023, 1030 (en banc) (*Velarde-Gomez*), quoting *United States v. Whitehead* (9th Cir. 2000) 200 F.3d 634, 638.)  This state of the law invites forum shopping by law enforcement and causes confusion for anyone arrested in California on a question that is always important:  If I remain silent, can my silence be used against me or not?

The United States Supreme Court has long held that the Fifth Amendment bars comment on a defendant's decision to remain silent at trial.  (*Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*).)  Likewise, in the context of custodial interrogation, "[t]he prosecution may not . . . use at trial the fact that he stood mute or claimed his privilege in the face of accusation."  (*Miranda*, *supra*, 384 U.S. at p. 468, fn. 37.)  The same "accusation" is present here:  An arrest entails an official accusation, supported by probable cause, that the suspect has committed a crime.  Instead of today's counterintuitive holding, I would follow the simple and sensible rule adopted by the Seventh, Ninth, and D.C. Circuits:  After being placed in custody, regardless of whether *Miranda* warnings have been given, the fact that the suspect remained silent may not be used as evidence of guilt in the prosecution's case-in-chief.  (Accord, *Velarde-Gomez*, *supra*, 269 F.3d at pp. 1028–1030; *Moore*, *supra*, 104 F.3d at p. 385; *United States v. Hernandez* (7th Cir. 1991) 948 F.2d 316, 322–323 (*Hernandez*).)

## I.

In this case, the prosecutor elicited testimony and made comments during trial suggesting that Tom's silence after the accident showed his consciousness of guilt.  In her direct examination of Sergeant Alan Bailey, the prosecutor asked, "So, during any of this time [at the accident scene], the defendant ever ask you about the occupants of the other vehicle?"  Sergeant Bailey answered, "No, he did

3

not." When defense counsel objected, the prosecutor said, "Consciousness of guilt," and the trial court overruled the objection. In her direct examination of Officer Josh Price, the prosecutor asked, "During those three hours [after the accident], did the defendant ever ask you about the condition of the occupants of the Nissan?" After defense counsel's objection was overruled, Officer Price answered, "No." In her closing argument, the prosecutor said that "how [Tom] acted the night of the collision" pointed to "his consciousness of his own guilt." She said one aspect was "particularly offensive, he never, ever asked, hey, how are the people in the other car doing? Not once. . . . [¶] Not once. Do you know how many officers that he had contact with that evening? Not a single one said that, hey, the defendant asked me how those people were doing. Why is that? Because he knew he had done a very, very, very bad thing, and he was scared. [¶] He was scared or -- either that or too drunk to care. But he was scared. And he was obsessed with only one thing, that is, saving his own skin."

Although Tom was not formally arrested until after he had been taken to the police station, the trial court ruled that he was under de facto arrest when Officer Price told him he was not free to leave the accident scene. The Court of Appeal below found, and this court agrees, that Tom was under de facto arrest when the police transported him to the station in a patrol vehicle. The police did not question him about the accident at that point and did not give him *Miranda* warnings until several hours later at the station. The issue in dispute is the prosecution's use of Tom's silence during the postarrest, pre-*Miranda* period as part of its case-in-chief.

Because today's opinion holds that Tom did not clearly invoke the right to remain silent and thus never exercised the right, the court declines to decide "whether the Fifth Amendment bars use of a defendant's postarrest, pre-*Miranda* exercise of the privilege against self-incrimination in the absence of custodial

4

interrogation." (Maj. opn., *ante*, at p. 16; see *id.* at pp. 14–15 [noting a split of authority on that question].) I would hold that even in the absence of interrogation, the Fifth Amendment's protections apply at least from the point that a suspect has been placed under arrest or otherwise taken into custody.

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The high court has construed this prohibition to mean that a criminal defendant has a right not to testify at trial. If a defendant chooses to remain silent, "the Fifth Amendment . . . forbids . . . comment by the prosecution on the accused's silence . . . ." (*Griffin*, *supra*, 380 U.S. at p. 615.) The high court has also held that the right to remain silent applies during custodial interrogation. In that context, too, the prosecution may not use at trial the fact that a defendant chose to remain silent. (*Miranda*, *supra*, 384 U.S. at p. 468, fn. 37.) *Miranda* mandated warnings that serve as "a prophylactic means of safeguarding Fifth Amendment rights." (*Doyle v. Ohio* (1976) 426 U.S. 610, 617 (*Doyle*).) But the *Miranda* warnings are not themselves the source of the rights stated in the warnings. The warnings are a means of giving effect to rights that are already operative when the police initiate custodial interrogation.

The question is whether the Fifth Amendment privilege against self-incrimination comes into play even earlier. The high court recently declined to resolve whether the Fifth Amendment bars a prosecutor from using a defendant's *non*custodial silence as evidence of guilt. (*Salinas v. Texas* (2013) 570 U.S. __, __ [133 S.Ct. 2174, 2179] (*Salinas*) (plur. opn. of Alito, J.).) But the case before us involves postarrest or custodial silence. The high court has said, in oft-quoted language, that *Miranda* "require[s] that a person taken into custody be advised *immediately* that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before

5

submitting to interrogation." (*Doyle*, *supra*, 426 U.S. at p. 617, italics added.) The premise of this statement is that a suspect who has been taken into custody has the right to remain silent, whether or not interrogation ensues. (Hence the familiar refrain: "You are under arrest. You have the right to remain silent. Anything you say may be used against you in a court of law. . . .") If the police do not give *Miranda* warnings immediately upon taking a suspect into custody, that does not pretermit or suspend the suspect's right to remain silent. Were it otherwise, the police would have an incentive to delay the warnings so that any postarrest, pre-*Miranda* silence could be used against the suspect. (See *Moore*, *supra*, 104 F.3d at p. 385.) And the suspect would face possible incrimination by anything he says as well as anything he does *not* say.

Some courts have held otherwise, relying on *Fletcher v. Weir* (1982) 455 U.S. 603 (*Fletcher*) for the rule that "the government may comment on a defendant's silence when it occurs after arrest, but before *Miranda* warnings are given." (*United States v. Rivera* (11th Cir. 1991) 944 F.2d 1563, 1568 (*Rivera*); see *United States v. Love* (4th Cir. 1985) 767 F.2d 1052, 1063 (*Love*).) But *Fletcher* adopted that rule specifically for prosecutorial use of a defendant's silence to impeach his own testimony at trial. In *Fletcher*, the high court reaffirmed its holding in *Doyle* that a prosecutor may not comment on a defendant's postarrest silence when *Miranda* warnings have been given, even for impeachment, because the warnings may "induce[] silence by implicitly assuring the defendant that his silence [will] not be used against him." (*Fletcher*, at p. 606.) But "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings," no similar unfairness occurs (*id.* at p. 607), and the use of defendant's silence for impeachment "follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial" (*Jenkins v. Anderson* (1980) 447 U.S. 231, 238 (*Jenkins*)).

6

In a nutshell, high court precedent holds that a defendant's decision to testify at trial effectively waives protection of his pretrial silence for impeachment purposes (per *Fletcher* and *Jenkins*) unless the administration of *Miranda* warnings has estopped the government from commenting on the defendant's silence altogether (per *Doyle* and *Miranda*). *Fletcher* was simply an application of the general principle that evidence otherwise off-limits to the prosecution may be used to impeach a defendant who chooses to testify at trial. (See *Harris v. New York* (1971) 401 U.S. 222, 224–226; *Walder v. United States* (1954) 347 U.S. 62, 65.) Neither *Fletcher* nor any other high court decision suggests that the Fifth Amendment right to remain silent does not apply in the postarrest, pre-*Miranda* context.

Recognizing that "the holding in *Fletcher* is restricted to use of silence for impeachment purposes," the Eighth Circuit in *United States v. Frazier* (8th Cir. 2005) 408 F.3d 1102 (*Frazier*) offered a different rationale for allowing the use of postarrest, pre-*Miranda* silence in the government's case-in-chief. (*Frazier*, *supra*, 408 F.3d at p. 1110.) Noting that the Fifth Amendment prohibits "compelled" self-incrimination, the Eighth Circuit said the key question was "whether Frazier was under any compulsion to speak at the time of his silence." (*Frazier*, at p. 1111.) The court reasoned: "Although Frazier was under arrest, there was no governmental action at that point inducing his silence. Thus he was under no government-imposed compulsion to speak. It is not as if Frazier refused to answer questions in the face of interrogation. . . . [A]n arrest by itself is not governmental action that implicitly induces a defendant to remain silent. *Fletcher*, 455 U.S. at 606." (*Ibid.*)

It is true that *Fletcher* rejected the contention that " 'an arrest, by itself, is governmental action which implicitly induces a defendant to remain silent.' " (*Fletcher*, *supra*, 455 U.S. at p. 606.) But in doing so, the high court merely

7

sought to distinguish an arrest from the administration of *Miranda* warnings for the purpose of limiting *Doyle*'s prohibition on the use of silence for impeachment to post-*Miranda* silence. (*Fletcher*, at p. 606.) Again, *Fletcher* nowhere suggested that the Fifth Amendment does not otherwise protect postarrest, pre-*Miranda* silence. *Fletcher* simply held that any protection is waived by the defendant's decision to testify at trial.

In discussing compulsion, *Frazier* focused on the compulsion inherent in custodial interrogation, which triggers an affirmative governmental inducement to remain silent, namely, the *Miranda* warnings. But custodial interrogation is not the only type of compulsion that implicates the Fifth Amendment. *Griffin* addressed a different kind of compulsion. A defendant who decides not to testify at trial does not do so in response to any questioning by the prosecutor or the judge. His silence is not induced by any governmental assurance like the *Miranda* warnings, nor is it a response to any "government-induced compulsion to speak." (*Frazier*, *supra*, 408 F.3d at p. 1111.) Yet *Griffin* held that such silence is protected because "comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' [citation], which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." (*Griffin*, *supra*, 380 U.S. at p. 614, fn. omitted.) The element of compulsion arises from the fact that allowing adverse comment on silence puts pressure on the defendant to take the witness stand, thereby undermining "the central purpose of the privilege—to protect a defendant from being the unwilling instrument of his or her own condemnation." (*Mitchell v. United States* (1999) 526 U.S. 314, 329 (*Mitchell*).) This pressure exists even if "a guilty defendant would choose to remain silent *despite* the adverse inference." (*Id.* at p. 331 (dis. opn. of Scalia, J.).)

8

The rule recognized in *Griffin* — that the Fifth Amendment privilege against compulsory self-incrimination "prohibit[s] an inference of guilt from a defendant's rightful silence" — has found "general and wide acceptance in the legal culture" and "has become an essential feature of our legal tradition." (*Mitchell*, *supra*, 526 U.S. at p. 330.)  This rule properly applies not only at trial or during custodial interrogation, but at any point after a suspect has been arrested or otherwise taken into custody.  For what is common to all of these contexts is that the suspect or defendant faces *an official accusation that he has committed a crime*.  An arrest requires probable cause, and " '[t]he substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' [Citation.] . . .  [I]t has come to mean more than bare suspicion:  Probable cause exists where 'the facts and circumstances with their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." (*Brinegar v. United States* (1949) 338 U.S. 160, 175 (*Brinegar*).)

The accusatory nature of an arrest is also confirmed by the investigatory license given to law enforcement after placing a person under arrest.  Although subject to limitations (see, e.g., *Riley v. California* (2014) 573 U.S. __ [134 S.Ct. 2473] (*Riley*)), the search incident to arrest doctrine has long authorized police to search an arrestee's person, personal property, or vehicle for evidence of crime in order to prevent its concealment or destruction.  (See *Arizona v. Gant* (2009) 556 U.S. 332; *United States v. Robinson* (1973) 414 U.S. 218; *Chimel v. California* (1969) 395 U.S. 752.)  Further, as pertinent here, California law provides that "[a] person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested" for various drunk-

9

driving offenses.  (Veh. Code, § 23612, subd. (a)(1)(A).)  Failure to comply will result in a fine, suspension of the suspect's driver's license, and other serious consequences.  (*Id.*, §§ 13353, 23612, subd. (a)(1)(D).)

In this case, the Court of Appeal below summarized "the increasingly coercive circumstances" of the police's interaction with Tom as follows:  "[T]he stop in this case was not 'temporary and brief.'  [Citation.]  Rather, defendant was held at the scene for approximately an hour and a half before he was placed into a patrol car and transported to the police station.  Moreover, during that time frame of approximately an hour and a half, the atmosphere surrounding defendant's detention became increasingly coercive.  In this regard, after paramedics had examined defendant and police officers had surveyed the accident scene, defendant asked Officer Price if he could walk to his home less than a block away. Price replied, 'I told him no.  That obviously the investigation was still ongoing. We needed him to remain at the scene.'  Later, after police denied defendant's request to walk home, Officer Felker removed defendant from the Toyota Camry, where he was seated with his girlfriend and Gamino, and placed him in the back of the patrol car at approximately 9:30 p.m.  Defendant was held in the patrol car for another twenty minutes before he was transported from the accident scene at 9:48 p.m. and driven to the police station for further investigation.  At no point prior to defendant's transportation from the scene did police tell defendant he was free to leave the accident scene.  To the contrary, defendant's request to leave the scene was denied."

In light of the coercive and accusatory setting that confronts a suspect who is placed under arrest, allowing adverse comment on the fact that the suspect chose to remain silent "in the face of accusation" (*Miranda*, *supra*, 384 U.S. at p. 468, fn. 37) burdens the suspect with a measure of compulsion to talk.  In this case, the prosecutor said in her closing argument, "I'm not saying that he has to say sorry as

10

an expression of his guilt or as some kind of confession, but simply as an expression of his regret. Look, I'm sorry those people were hurt." But such fine parsing seems a bit much to expect from a suspect taken into custody at an accident scene that Officer Price described as "fairly chaotic." For a person who has been arrested, talking often carries a significant risk of self-incrimination.

The issue of postarrest, pre-*Miranda* silence typically arises in situations where, as here, the prosecution contends that the defendant, upon being arrested or confronted with contraband, showed consciousness of guilt by reacting with silence instead of concern, surprise, or indignation as an innocent person would. Penalizing silence in this way, thereby pressuring the suspect to speak and possibly incriminate or perjure himself (or both), imposes the same type of burden that *Griffin* found impermissible in the context of trial. If the right to remain silent did not apply at all in the postarrest, pre-*Miranda* context, then a suspect would face "the 'cruel trilemma' of incriminating himself, lying, or demonstrating his guilt by silence." (Maj. opn., *ante*, at p. 24.) Whatever choice the suspect makes, he becomes "the unwilling instrument of his or her own condemnation." (*Mitchell*, *supra*, 526 U.S. at p. 329.)

In sum, a suspect who has been arrested or otherwise taken into custody has a right under the Fifth Amendment to remain silent, whether or not *Miranda* warnings have been given.

**II.**

At the same time, the Fifth Amendment "does not establish an unqualified 'right to remain silent.' " (*Salinas*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2183] (plur. opn. of Alito, J.).) It protects silence that constitutes an exercise of the privilege against compelled self-incrimination, not silence attributable to other reasons. In order to trigger the Fifth Amendment's protection, the court today holds, a suspect in custody may not simply remain silent. Instead, the suspect

11

must "clearly," "timely," and "unambiguously" invoke the Fifth Amendment privilege (maj. opn., *ante*, at pp. 2, 27) so that "a reasonable police officer in the circumstances would understand that the defendant had invoked the privilege either at or prior to the silence at issue" (*id.* at p. 21).

But this invocation rule lacks sound justification. It is derived from case law addressing what a suspect must do to exercise the Fifth Amendment privilege *in the face of questioning by law enforcement*. The issue of whether a suspect's postarrest, pre-*Miranda* silence may be used at trial as evidence of guilt ordinarily arises in situations where, as here, the silence did not occur in response to interrogation. That is because any response to pre-*Miranda* (i.e., unwarned) custodial interrogation would be inadmissible under *Miranda* itself. As explained below, the concerns that justify a clear invocation rule in the context of police questioning do not justify application of the same rule here. This case is not about police interrogation; it is about the prosecution's use of a suspect's postarrest, pre-*Miranda* silence to prove guilt at trial.

First, it is settled that "a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege *rather than answer* if he desires not to incriminate himself." (*Minnesota v. Murphy* (1984) 465 U.S. 420, 429, italics added.) As the italicized words show, this rule applies when the prosecution seeks to incriminate a defendant not on the basis of silence, but on the basis of what the defendant said in response to government questioning. The reason is that "if he chooses to answer, his choice is considered to be voluntary" and thus waives any privilege he might have exercised. (*Ibid.*) The right to remain silent may be waived by a defendant's voluntary answers during a noncustodial interview (see *id.* at pp. 429–434) or during custodial interrogation, even when the answers follow a prolonged silence (see *Berghuis v. Thompkins* (2010) 560 U.S. 370, 382–387 (*Berghuis*)).

12

But these cases, which involve a decision *to speak in response to questioning*, do not stand for the odd proposition that a decision *to remain silent in the absence of questioning* likewise waives the right to remain silent unless the defendant has clearly invoked it.

Second, the high court has adopted a clear invocation rule in order to guide police conduct in the specific context of custodial interrogation. In *Davis v. United States* (1994) 512 U.S. 452, the high court held that a suspect who wants to invoke the right to counsel during custodial interrogation must do so "unambiguously," that is, "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Id.* at p. 459.) In *Berghuis*, the high court applied the same rule to invoking the right to remain silent during custodial interrogation. (*Berghuis*, *supra*, 560 U.S. at p. 381.) The rationale for this rule — in particular, its "objective inquiry" into what "a reasonable police officer in the circumstances would understand" — is "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations." (*Davis*, at pp. 458–459; see *Berghuis*, at p. 382 ["If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' [*Davis*, at p. 461.]"].) But the need to give clear guidance to police officers so they do not have to guess whether to stop questioning a suspect has nothing to do with the issue in this case. The issue here is not whether the police overstepped in questioning Tom about the circumstances of the accident against his wishes. The issue is whether the prosecution overstepped in using Tom's silence in the absence of questioning as part of its case-in-chief.

Third, in the context of noncustodial police questioning, as in *Salinas*, there are additional reasons for a clear invocation rule: "That requirement ensures that

13

the Government is put on notice when a witness intends to rely on the privilege so that it may either argue that the testimony sought could not be self-incriminating, see *Hoffman v. United States*, 341 U.S. 479, 486 (1951), or cure any potential self-incrimination through a grant of immunity, see *Kastigar v. United States*, 406 U.S. 441, 448 (1972). The express invocation requirement also gives courts tasked with evaluating a Fifth Amendment claim a contemporaneous record establishing the witness' reasons for refusing to answer. See *Roberts v. United States*, 445 U.S. 552, 560, n. 7 (1980) ('A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give'); [citation]. In these ways, insisting that witnesses expressly invoke the privilege 'assures that the Government obtains all the information to which it is entitled.' [Citation.]" (*Salinas*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)

These concerns are also far afield from the issue here, which does not involve an attempt by the government to obtain incriminating information from Tom. When a witness is being questioned by a government officer, a clear invocation rule gives the government an opportunity to dispel any real or perceived risk of self-incrimination and, in turn, to lawfully insist that the witness provide the information sought. Absent a risk of self-incrimination, the witness cannot rely on the Fifth Amendment in refusing to answer. That explains why *Roberts v. United States* (1980) 445 U.S. 552 (*Roberts*) held that the defendant's refusal, before and after his arrest, to name the suppliers of illegal drugs could be used against him at trial. The information sought by the government would have incriminated others; there was no reason to think it would have (further) incriminated Roberts. In that context, Roberts's failure to invoke the privilege precluded his reliance on it. The precise holding of *Roberts* is: "*At least where the Government has no substantial reason to believe that the requested disclosures are likely to be incriminating*, the privilege may not be relied upon unless it is

14

invoked in a timely fashion." (*Id.* at p. 559, italics added; see *id.* at p. 562 (conc. opn. of Brennan, J.) ["[B]ecause the Government questioning to which he failed to respond was not directed at incriminating him, petitioner may not stand upon a Fifth Amendment privilege that he never invoked at the time of his silence."].)

Thus, a clear invocation is required when it is necessary to put the government on notice that a defendant's refusal to answer questions is based on fear of self-incrimination. In this case, Tom's silence about the crash victims did not occur in response to police questioning. The dispute does not involve an effort by the government to obtain incriminating information from a suspect, and there is no similar problem of notice. Indeed, the state can hardly suggest it had "no substantial reason to believe" Tom remained silent for fear of self-incrimination (*Roberts*, *supra*, 445 U.S. at p. 559) when the prosecution's whole point was that Tom said nothing about the accident victims because he was consumed by consciousness of his own guilt.

Nor does the three-justice plurality opinion in *Salinas*, on which today's opinion heavily relies, support a clear invocation rule here. (See *Salinas*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2177] (plur. opn. of Alito, J., joined by Roberts, C.J., and Kennedy, J.).) The plurality concluded that the Fifth Amendment did not bar the prosecution from using Salinas's precustodial, pre-*Miranda* silence in response to police questioning as evidence of his guilt because "he did not expressly invoke the privilege against self-incrimination in response to the officer's question." (*Salinas*, at p. __ [133 S.Ct. at p. 2178].) The plurality's rationale is inapplicable to postarrest, pre-*Miranda* silence for two reasons.

First, *Salinas*, like the other cases above, involved police questioning. As its dominant theme, the plurality emphasized " 'the general principle that the Government has the right to everyone's testimony.' " (*Salinas*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.); see *id.* at p. __ [133 S.Ct. at

15

p. 2181] [adopting an exception to invocation requirement "would needlessly burden the Government's interests in obtaining testimony"].) The plurality reasoned that limiting the protection of silence by means of an invocation rule properly "pressure[s] suspects" into answering the government's questions (*id.* at p. __ [133 S.Ct. at p. 2183]) and thereby " 'assures that the Government obtains all the information to which it is entitled' " (*id.* at p. __ [133 S.Ct. at p. 2179]). As noted, postarrest, pre-*Miranda* silence typically (as in this case) does not involve a refusal to answer questions posed by law enforcement, since unwarned questioning of a suspect in custody generally does not yield admissible evidence. (See *Velarde-Gomez, supra*, 269 F.3d at pp. 1026–1028 [silence upon police discovery of contraband]; *Moore, supra*, 104 F.3d at p. 384 [same]; *Frazier, supra*, 408 F.3d at p. 1109 [silence upon being arrested]; *Hernandez, supra*, 948 F.2d at p. 322 [same]; *Rivera, supra*, 944 F.2d at pp. 1567–1568 [silence during police inspection of luggage for contraband]; *Love, supra*, 767 F.2d at p. 1063 [no police questioning; defendants "made no effort to explain their presence at the Lee farm on the night of their arrest"].)

Second, although the *Salinas* plurality went beyond *Roberts* in applying the invocation rule "even when an official has reason to suspect that the answer to his question would incriminate the witness" (*Salinas, supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2181] (plur. opn. of Alito, J.)), the opening words of the plurality opinion remain significant: "*Without being placed into custody* or receiving *Miranda* warnings, petitioner *voluntarily* answered the questions of a police officer who was investigating a murder." (*Id.* at p. __ [133 S.Ct. at p. 2177], italics added.) Despite "official suspicions," the plurality reasoned, the fact that a person voluntarily agreed to a noncustodial interview with the police renders his silence in response to questioning " 'insolubly ambiguous.' " (*Id.* at p. __ [133 S.Ct. at p. 2182].) In such circumstances, "someone might decline to answer a

16

police officer's question in reliance on his constitutional privilege. But he also might do so because he is trying to think of a good lie, because he is embarrassed, or because he is protecting someone else. Not every such possible explanation for silence is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment." (*Ibid.*) In saying this, the *Salinas* plurality was treating noncustodial silence as a broad category. Given the range of possible reasons for silence in cases where a witness voluntarily submits to a noncustodial police interview, the plurality thought it best to adopt an express invocation requirement for the entire category, even if "reliance on the Fifth Amendment privilege is the most likely explanation for silence in a case such as [Salinas's]." (*Ibid.*)

After a person has been arrested, however, the context is different. As discussed earlier, an arrest entails a formal accusation based on probable cause, and "probable cause means 'a fair probability that contraband or evidence of a crime will be found.' " (*United States v. Sokolow* (1989) 490 U.S. 1, 7.) Probable cause is a higher standard than "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " (*Ibid.*; see *Brinegar*, *supra*, 338 U.S. at p. 175.) Accordingly, a suspect's silence after being arrested gives rise to a much stronger inference of reliance on the Fifth Amendment privilege than a witness's noncustodial silence even "in the face of official suspicions." (*Salinas*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2182] (plur. opn. of Alito, J.).) When "official suspicions" have ripened into probable cause for arrest, a suspect's silence correspondingly becomes more suggestive of fear of self-incrimination. Just as the *Salinas* plurality's invocation rule is premised on the relatively uncertain reasons for silence in the noncustodial context, a rule that bars use of a suspect's postarrest, pre-*Miranda* silence as evidence of guilt is premised on the relatively predictable reason for silence in the custodial context.

17

In reality, neither rule is perfect. There will be cases where the true reason for a suspect's custodial silence is something other than fear of self-incrimination, just as there will be cases where the true reason for a witness's noncustodial silence is fear of self-incrimination even though the witness failed to expressly invoke the Fifth Amendment. But the different rules are intended to govern two broad categories of cases — custodial and noncustodial — in light of a general feature that differentiates them, i.e., the accusatory nature of an arrest. No general rule can perfectly capture the true reason for silence in every case; Salinas, for example, may well have remained silent for fear of self-incrimination. (See *Salinas*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2182] (plur. opn. of Alito, J.); *id.* at p. __ [133 S.Ct. at pp. 2189–2190] (dis. opn. of Breyer, J.).) Nevertheless, the generality of the rules in this context, as in others, is designed to yield fair results in the mine run of cases to which they apply and, equally important, to set expectations and guide future conduct by law enforcement and the citizenry. (*Id.* at p. __ [133 S.Ct. at p. 2183] (plur. opn. of Alito, J.); cf. *Riley*, *supra*, 573 U.S. at p. __ [134 S.Ct. at p. 2495] [rejecting various fact-based limitations on the warrant requirement in favor of a "simple" rule for searching cell phones incident to arrest—"get a warrant"].) Today's decision seems unlikely to yield fair results in most cases because it is so counterintuitive. Here, as in *Riley*, it is better to adopt a simple rule consistent with ordinary expectations: Upon being arrested, you have a right to remain silent in order to avoid self-incrimination, and if you remain silent, your silence may not be used against you as evidence of guilt.

Today's decision gives rise to two additional concerns. First, in rejecting the contention that the invocation rule will give law enforcement an incentive to delay *Miranda* warnings after an arrest, the court says "the same incentive to delay *Miranda* warnings already exists by virtue of the high court's decision in *Fletcher v. Weir* . . . ." (Maj. opn., *ante*, at p. 29.) But this concern surely has "greater

18

force here" (*id.* at p. 30) because *Fletcher* involved only the use of silence to impeach the defendant at trial if he chooses to testify, whereas the issue here is the use of silence to prove guilt in the prosecution's case-in-chief. Whatever incentive police officers may have to delay *Miranda* warnings when they do not know whether a suspect will end up testifying at trial, they certainly have a greater incentive to delay *Miranda* warnings when any postarrest silence may be used to prove the suspect's guilt unless he clearly invokes the Fifth Amendment privilege.

Second, how is the invocation rule supposed to work in practice? Because pre-*Miranda* silence ordinarily does not occur in response to police questioning, the court must envision that a suspect, immediately after being arrested, will take the initiative to get a police officer's attention and declare his desire to invoke the Fifth Amendment privilege. Assuming the suspect has the awareness and presence of mind to do that (even in a "fairly chaotic" situation like the car accident here), what exactly must he say? Crucially, is it enough for a suspect to say, "I don't want to talk"? Or must the suspect mention the Fifth Amendment or otherwise indicate that the reason he doesn't want to talk is to avoid self-incrimination? (See *Quinn v. United States* (1955) 349 U.S. 155, 164 ["no ritualistic formula is necessary in order to invoke the privilege"].)

The rationale for the invocation rule would suggest that a suspect must make clear "his reasons" for wanting to remain silent. (*Salinas*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2183] (plur. opn. of Alito, J.).) Yet this court, perhaps sensing how unrealistic this is, cannot bring itself to say that this is required. Instead, among the examples it gives of situations where "the defendant actually invoked his rights" (maj. opn., *ante*, at p. 27), the court cites *United States ex rel. Savory v. Lane* (7th Cir. 1987) 832 F.3d 1011, where the defendant told police "that 'he didn't want to talk about it, he didn't want to make any statements.' " (*Id.* at p. 1015.) If saying *that* is enough for a suspect to put the police on notice

19

that his reason for remaining silent is to avoid self-incrimination, then I do not see how simply remaining silent is materially different. The statement "I don't want to talk" is no more suggestive of a suspect's reason for silence than the act of remaining silent itself. In either case, the desire to avoid self-incrimination is a natural inference from the fact that the suspect faces an official accusation of crime supported by probable cause. We should not "exalt form over substance" in recognizing the exercise of constitutional rights by ordinary people. (*Escobedo v. Illinois* (1964) 378 U.S. 478, 486.)

## III.

For reasons persuasively set forth by the Court of Appeal below, the prosecution's use of Tom's silence about the crash victims in its case-in-chief cannot be deemed harmless error. The jury was instructed that "[g]ross negligence is the exercise of so slight a degree of care as to exhibit a conscious indifference or 'I don't care' attitude concerning the ultimate consequences of one's conduct." Relying on testimony of an accident reconstruction expert, the prosecutor argued that Tom's pre-impact speed was at least 67 miles per hour, demonstrating gross negligence. But this testimony was disputed by a defense expert who estimated Tom's speed to be around 50 miles per hour, a speed that police deemed safe for that road under certain conditions. Given this conflicting expert testimony, the prosecutor's emphasis on Tom's failure to ask about the crash victims was a significant aspect of her claim that Tom "was driving down that night . . . without a care of what was going to happen. I don't care is the attitude that he had." The improper use of Tom's postarrest, pre-*Miranda* silence was not harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

For the reasons above, I would affirm the judgment of the Court of Appeal.


LIU, J.

I CONCUR:  RYLAARSDAM, J.*

---

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Tom
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 204 Cal.App.4th 480
**Rehearing Granted**

_____

**Opinion No.** S202107
**Date Filed:** August 14, 2014
_____

**Court:** Superior
**County:** San Mateo
**Judge:** H. James Ellis

_____

**Counsel:**

Marc J. Zilversmit for Defendant and Appellant.

Michael T. Risher for American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman, Mark S. Howell, Laurence K. Sullivan, Seth K. Schalit and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Marc J. Zilversmit
523 Octavia Street
San Francisco, CA  94102
(415) 431-3472

Jeffrey M. Laurence
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-5897